UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

AMY LEVENSON,

          Plaintiff,

   - against -

BARCLAYS PLC, BARCLAYS BANK PLC and
BARCLAYS CAPITAL INC.,

          Defendants.
-------------------------------------------------------------X

ECF CASE

Case No. 07 CV 6656
Judge Hellerstein

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

      Plaintiff Amy Levenson ("Levenson" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants Barclays PLC, Barclays Bank PLC and Barclays Capital Inc. ("Barclays Capital") (collectively "Barclays," "Bank," or "defendants"), as follows:

## NATURE OF CLAIMS

      1.    This is an action to remedy discrimination on the basis of sex for defendants' failure to pay male and female employees equal wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), and the New York State Labor Law § 194 (the "Labor Law"), and to remedy sex discrimination in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296 et seq. (the "Human Rights Law"), and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

      2.    Plaintiff has over twenty years of experience in securities trading and sales. Despite her consistently high record, she was assigned fewer lucrative accounts than her male peers. Initially working part-time, she decided to return to full time work and to be provided better job

245693 v2

opportunities. Notwithstanding her qualifications, as evidenced by several competitive job offers, she was asked why she wanted to work full time. She transferred to a new unit seeking a better career opportunity and better pay, but was assigned work that her supervisor called "administrative," and ultimately she was compensated not only less than her male peers, but less than her own prior earnings for part-time work.

3. Plaintiff seeks compensatory, liquidated, and punitive damages, injunctive and declaratory relief, and appropriate legal and equitable relief.

4. Plaintiff has filed a separate arbitration proceeding at the National Association of Securities Dealers for breach of contract, promissory estoppel, quantum meruit, and to remedy unlawful reduction of her wages, and retaliation for her opposition to such unlawful reduction, in violation of New York Labor Law §§ 193(1) & 215 ("Labor Law").

## JURISDICTION AND VENUE

5. Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343(a), and the EPA, 29 U.S.C. § 216(b). This Court has supplemental jurisdiction over plaintiff's Labor Law, Human Rights Law, and City Law claims pursuant to 28 U.S.C. § 1367.

6. Jurisdiction of this Court is also proper under 28 U.S.C. § 1332 as the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

8. Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights

and the Corporation Counsel of the City of New York. Plaintiff has complied fully with all prerequisites to jurisdiction in this Court.

## PARTIES

9. Levenson has been employed at Barclays from April 2004 to present. She is a citizen of New Jersey.

10. Defendant Barclays PLC is a British corporation that does business in New York.

11. Defendant Barclays Bank PLC is a British corporation that does business in New York.

12. Defendant Barclays Capital is a Connecticut corporation with its principal place of business at 200 Park Avenue, New York, NY 10166.

13. Barclays Capital PLC and Barclays Bank PLC are wholly owned subsidiaries of Barclays PLC.

14. All defendants are employers within the meaning of the EPA, the Labor Law, the Human Rights Law, and the City Law.

## FACTUAL ALLEGATIONS

### Initial Barclays Job

15. Levenson has over twenty years experience in fixed income sales and trading. She holds an MBA in Finance from Columbia Business School. She joined Goldman Sachs in 1990 and, after trading corporate bonds for several years, moved into sales in 1997. She was working as one of the most accomplished fixed-income vice presidents, a top ranked credit salesperson, by the time she left in 2004.

16. As a successful salesperson with an impressive record, Levenson and a partner with whom she had a jobshare sought job opportunities that would afford them more competitive compensation and a better account base.

17. Levenson received other competitive expressions of interest. Levenson eventually agreed to go to work for Barclays for a rate of compensation of $1.7 million annually for full time work. Because Levenson was increasing her work to 80% time (four days a week), she negotiated and received an annual compensation of $1.36 million, 80% of the 1.7 million annually agreed upon figure. This compensation included a base salary, a bonus, and a small equity award, totaling the agreed amount.

18. Levenson and her jobshare partner gave Goldman Sachs notice. Goldman Sachs offered to match whatever the Barclays offer was, but Levenson explained that she did not want to break her commitment to Barclays.

19. Levenson began work at Barclays in April 2004 in Barclays Capital's corporate bond sales group. She achieved better results than those of most of her peers. For example, Levenson brought in approximately $1 billion in business from a client that previously had done little or no business with Barclays.

20. Although Levenson began at Barclays in traditional cash credit sales, she recognized the need to expand her skills to respond to a changing market, and quickly learned credit derivative sales. At the end of 2005, Levenson was ranked the top credit salesperson, and derivative traders (both exotic and regular) viewed her as one of the most respected salespeople in that product.

21. Levenson also produced work that increased the efficiency and profitability of her entire team, such as creating a daily securities update and an Index component update that Barclays continued in her absence through the work of four employees.

22. Despite these achievements, when Levenson requested new accounts, she was refused, and the accounts were assigned instead only to male salespeople in the derivatives group.

Barclays' Leverage Finance Offer

23. In early January 2006, Levenson began to seek employment opportunities outside Barclays that would afford her better access to accounts and better compensation. She had also decided to return to full time work, so she discussed annual compensation with potential employers at a full time rate over the $1.7 million Barclays rate.

24. She ultimately received three indicative job offers, two for $2 million and one for $1.8 million annual compensation for 2006, with other firms also expressing interest at similar pay rates.

25. On February 22, 2006, while Levenson was weighing various possibilities, John Stathis ("Stathis"), Barclays Capital's National Sales Manager, called her into his office, expressed concern that Levenson was planning to leave, and asked for "time" to persuade her to stay.

26. In the ensuing weeks, Levenson and Stathis had several further discussions. Levenson told Stathis that she would consider staying at Barclays only if she could join the new leverage finance team Barclays was building, because this type of work paid well and afforded

opportunity for career growth. She also explained that it would benefit Barclays because Levenson could bring derivative expertise to it. Stathis expressed interest in this proposal.

27.     Levenson also explained that she was going back to full time work. Stathis asked her why on at least two occasions. Levenson said "for the money," and explained that she wanted to earn 100% instead of 80% of a competitive annual compensation rate.

28.     In early April 2006, Joseph McGrath ("McGrath"), recently arrived as one of the heads of leverage finance for Barclays Capital, offered Levenson the position she had discussed with Stathis.

29.     Levenson promptly went to Stathis, and asked that he guarantee that, in accepting this position, she would not be economically disadvantaged over the other opportunities she was giving up. Stathis emphatically stated "that's easy," agreeing to the compensation as Levenson had proposed, and motioned her to the door.

30.     On information and belief, however, Stathis did not tell McGrath about the promise he had made to Levenson concerning her compensation.

<u>Levenson's Leverage Finance Work</u>

31.     Thus, on May 1, 2006, Levenson began working for McGrath in the new high yield, leverage finance job.

32.     McGrath assured Levenson that she had a "free pass" on sales credits for the first year, and that she should focus on building the new group's infrastructure.

33.     Levenson's work included selling distressed bonds, selling high yield bonds, selling derivative products, selling structured products, entertaining and prospecting clients, recruiting sales people, and promoting the group within the firm. The leverage finance group

included two male directors, Peter Mackie ("Mackie") and Chris Rulon-Miller ("Rulon-Miller"), who performed virtually identical work.

34. On information and belief, Mackie and Rulon-Miller received compensation that was substantially higher than Levenson's.

35. Levenson was charged with additional tasks that she performed on top of the work that was the same as what Mackie and Rulon-Miller did. Specifically, she was responsible for the internal aspects of building the group, a demanding job that caused her to put in long hours on work such as training sales personnel and developing efficient internal mechanisms for the fast-paced communication required to be competitive in the market. She achieved impressive results, and was a major factor in creating an efficient sales team.

36. In the fall of 2006, Levenson received a semi-annual review grade of 'A,' the highest possible, from McGrath. McGrath stated several times that the group's launch would have been three months later had it not been for Levenson's contribution.

37. Levenson also paid careful attention to the aspect of her job that required compliance with securities regulation both in the leverage finance business unit and in the credit businesses generally.

38. From the beginning of her time in the leverage finance group, Levenson had to contend with sex discrimination. For example, Levenson, one of the only two women in the group, was assigned very few of the forty "top accounts" -- customers predetermined, because of their relationship with the Bank, to receive favorable treatment in the coveted new issue allocation process and, therefore, bring in high sales credits -- compared with her male colleagues. Eighteen accounts initially assigned to Levenson were reassigned to men.

39. In mid-2006, Levenson was excluded from a pre-launch group business trip attended by most of her male peers.

40. McGrath regularly minimized and belittled Levenson's substantive work by terming it "administrative," a characteristic he did not attribute to her male peers' work. In addition, he assigned her work he considered "administrative," such as analyzing and inputting documents he had taken from his former employer, Goldman Sachs, for information to facilitate Barclays' leverage finance buildout.

41. Levenson's concern about this dismissal of her substantive work drove Levenson to attend internal coaching sessions, where she explained that she was experiencing problems because she was a woman and sought ways to resolve them.

42. Levenson twice asked McGrath to stop referring to her work as "administrative," and gave him detailed outlines of her work and accomplishments to demonstrate that it was not administrative.

43. In late 2006, Levenson was one of two women to attend a golf tournament that the leverage finance group organized to network with clients. There were approximately 100 participants. Levenson was singled out to be "cut," to achieve even numbers, and told to walk the course instead of golfing. This action significantly diminished her status in front of a number of clients, as well as her peers. Employees below Levenson's rank were not cut. McGrath acknowledged that he made the decision to cut her.

44. After several months of Levenson's work building the business of the new leverage finance group, in November 2006, during an internal "Town Hall" sales meeting, McGrath

implied that Levenson's backbreaking contribution was comparable to that of a male colleague who had started at Barclays that day.

45.     In November 2006, Levenson attended a meeting of directors and above held in New Jersey. She was one of only 4 or 5 women out of the dozens of high-level employees there.

46.     Prior to the conference, Levenson had developed several innovative business strategies for the group. McGrath assigned the presentation of her ideas to Levenson's male colleagues, who had not come up with them and were far less knowledgeable about them than she. Several times during the presentation, the men had to refer questions to Levenson.

47.     McGrath repeatedly made last-minute cancellations of his previously accepted attendance at Levenson's meetings and events with her clients. He did not do this for her male peers.

48.     Similarly, he interfered with her attendance at a January 2007 professional conference in Las Vegas which eleven of her clients attended, only allowing an abbreviated, last-minute trip. He routinely approved higher expenses for Levenson's male peers for athletic events to build client relationships.

49.     Levenson told Chris Yanney, head of high yield trading for Barclays Capital, and Erin Mansfield, Barclays' U.S. head of compliance, that she believed McGrath's actions and statements were sexist.

<u>Barclays Questions Its Compensation Obligation</u>

50.     In early October 2006, however, Levenson mentioned to McGrath that Stathis had committed to provide her with competitive annual compensation. McGrath reacted

245693 v2

angrily and stated that he did not intend to pay her "one cent more" than an intermediate salesperson, despite the fact that he had often referred to her as a senior salesperson in private meetings.

51. Levenson sought advice from Barclays executives, hoping to resolve the matter amicably. They advised her not to be "confrontational," and not to discuss details of this conflict with anyone.

52. Levenson, therefore, initiated a discussion with McGrath in which she explained her abilities and contribution and asked that he pay her what Stathis had agreed. McGrath refused. She tried to follow up with Stathis, but he avoided her.

### Reduced Compensation

53. On or about February 8, 2007, Barclays notified Levenson that it was paying her approximately the same amount for her full time work in 2006 as she had received for part time work in 2005. Thus, instead of honoring its agreement to pay her more to match the competitive offers she had received, Barclays gave her a net pay cut of about 20%.

54. On information and belief, no male director received less than his agreed compensation.

### FIRST CAUSE OF ACTION

### Discrimination Under the EPA

55. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 54 of the Complaint.

56. By the acts and practices described above, defendants, in violation of the EPA, have discriminated against plaintiff by paying male employees higher wages than plaintiff

was paid for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

57. Defendants knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiff's statutorily protected rights.

58. Plaintiff suffered lost wages as a result of defendants' willful and unlawful conduct.

## SECOND CAUSE OF ACTION

### Discrimination Under the Labor Law

59. Plaintiff repeats and realleges paragraphs 1 through 58 of this Complaint.

60. By the acts and practices described above, defendants have discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job, the performance of which required equal skill, effort, and responsibility, and which was performed under similar working conditions, in violation of the New York State Labor Law.

61. Defendant knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for plaintiff's statutorily protected rights.

62. Plaintiff suffered lost wages as a result of defendants' willful and unlawful conduct.

## THIRD CAUSE OF ACTION

### Sex Discrimination – Human Rights Law

63. Plaintiff repeats and realleges paragraph 1-62 above.

64. By acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of employment on the basis of her sex, in violation of the Human Rights Law.

65. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages.

## FOURTH CAUSE OF ACTION

### Sex Discrimination – City Law

66. Plaintiff repeats and realleges paragraphs 1-65 above.

67. By acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of employment on the basis of her sex, in violation of the City Law.

68. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court:

a. declare the acts and practices complained of herein to be violations of Title VII, the EPA, the Labor Law, the Human Rights Law and the City Law.

b. enjoin and permanently restrain these violations of Title VII, the EPA, the Labor Law, the Human Rights Law and the City Law;

c. direct defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

  d. award plaintiff damages to make her whole for all earnings she would have received but for defendants' discriminatory treatment, including, but not limited to, wages, commissions, bonuses, pension and retirement, health care coverage and other lost benefits, including future lost wages and benefits;

  e. award plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

  f. direct defendants to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's statutory rights;

  g. direct defendants to pay liquidated damages under the EPA;

  h. award plaintiff damages to compensate for any adverse tax consequences;

  i. award pre-judgment interest;

  j. award plaintiff attorneys' fees, costs and disbursements;

  k. award plaintiff such additional relief as the Court may deem just and proper.

Dated: New York, New York
   July 24, 2007

            VLADECK, WALDMAN, ELIAS &
            ENGELHARD, P.C.

       By: *Anne Vladeck*
            Anne C. Vladeck (AV 4857)
            Maia Goodell (MG 8905)
            Attorneys for Plaintiff
            1501 Broadway, Suite 800
            New York, New York 10036
            (212) 403-7300